## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____

DRITAN DUKA,                                    :
                                                :
                                                :
                     Petitioner,                :        Civ. No. 13-3664 (RBK)
                                                :
         v.                                     :        **OPINION**
                                                :
UNITED STATES OF AMERICA,                       :
                                                :
                     Respondent.                :
_____ :


_____

SHAIN DUKA,                                     :
                                                :
                                                :
                     Petitioner,                :        Civ. No. 13-3665 (RBK)
                                                :
         v.                                     :        **OPINION**
                                                :
UNITED STATES OF AMERICA,                       :
                                                :
                     Respondent.                :
_____ :


_____

ELJVIR DUKA,                                    :
                                                :
                                                :
                     Petitioner,                :        Civ. No. 13-3666 (RBK)
                                                :
         v.                                     :        **OPINION**
                                                :
UNITED STATES OF AMERICA,                       :
                                                :
                     Respondent.                :
_____ :

**ROBERT B. KUGLER, U.S.D.J.**

## I.      INTRODUCTION

Petitioners Dritan Duka, Eljvir Duka and Shain Duka (collectively referred to as the "Dukas"), seek relief through counsel on their sole remaining claim in their motions to vacate, set aside or correct their sentences pursuant to 28 U.S.C. § 2255. For the following reasons, the Dukas' sole remaining claim will be denied.

## II.      BACKGROUND

This Court set forth the factual background giving rise to the Dukas' federal convictions in its prior Opinion dated September 30, 2015 and need not do so at such length here. *See Duka v. United States*, Nos. 13-3664, 13-3665, 13-3666, 2015 WL 5768796 (D.N.J. Sept. 30, 2015). The Dukas (and their co-defendants Serdar Tatar and Mohamad Shnewer) went to trial on the charges against them in 2008. The Dukas did not testify at trial (nor did Tatar or Shnewer). Prior to the close of the Dukas' case at trial, this Court conducted a colloquy with the Dukas and their respective trial counsel (Michael Huff, Esq. for Dritan Duka, Troy Archie, Esq. for Eljvir Duka and Michael Riley, Esq. for Shain Duka) on December 9, 2008 regarding their right to testify in their own defense and whether they were waiving that right. That colloquy went as follows:

> THE COURT:  All right. We were talking about the defendants and their testimony. I understand the representation that they are not going to testify. As we talked about yesterday, we need to go through this. So we'll start with defense counsel. I'll go right down the line . . . Mr. Huff, have you explained to your client his right, absolute right to testify in this matter and that you, although you may advise against it, cannot stop him if that's what he wants to do?
> MR. HUFF:  Yes, your Honor.
> THE COURT:  You've advised him that if he chooses not to testify that will not be held against him?
> MR. HUFF:  Yes.
> THE COURT:  And what is his decision?
> MR. HUFF:  Not to testify.

THE COURT:  Thank you. Mr. Archie, have you advised your client of his absolute right to testify and though you may advice again [sic] it –

MR. ARCHIE:  I have, your Honor.

THE COURT: -- he doesn't have to follow your advise [sic] and he may testify if he so chooses.

MR. ARCHIE:  I have, Judge.

THE COURT:  Have you also advised him he has the right not to testify, if he chooses not to testify, that will not be held against him?

MR. ARCHIE:  I have, Judge, alone and collectively as a group.

THE COURT:  And what is his decision?

MR. ARCHIE:  He's not going to testify, Judge.

THE COURT:  Thank you. Mr. Riley.

MR. RILEY:  Yes, sir.

THE COURT:  Have you advised your client of his absolute right to testify and that though you may advise against it, he doesn't have to follow your advise [sic] and he can testify if he wants to?

MR. RILEY:  Yes, sir, I have.

THE COURT:  Have you advised him of his right not to testify and that if he chooses not to testify that will not be held against him?

MR. RILEY:  Yes Judge, he clearly understands that.

THE COURT:  And what is his choice?

MR. RILEY:  His election is not to testify.

. . . .

THE COURT:  All right, thank you. I'm going to ask each of your clients. . . . Mr. Duka. Your attorney has advised me that he has talked to you about this. He's explained to you you have an absolute right to testify, that he cannot stop you. Even if he advises against it if you want to testify, we'll honor your right to testify. He's also advised you you have a right not to testify and if you choose not to testify that will not be held against you. He has further advised me that you've exercised your choice not to testify. Now, if you say nothing, I will assume that's true. However, you may make any comment you want at this time.

DEFENDANT TONY [DRITAN] DUKA:  Yes, he has advised me and I chose not to testify.

THE COURT:  Thank you sir. Mr. Duka, your attorney has told me he has advised you have absolute right to testify, that he cannot stop you or prevent you from testifying if he want to testify. He's also told me that he's advised you have a right not to testify and that would not be held against you. He further advises that you choose not to testify. Again, you need not comment. If you don't comment, I will assume that what he says is true, but you may comment if you like.

DEFENDANT ELJVIR DUKA:  What he says is true and correct.

3

> THE COURT:  You are not going to testify.
> DEFENDANT ELJVIR DUKA:  No.
> THE COURT:  Thank you. Mr. Duka, again your attorney had advised me that he cannot stop you from testifying even though he may advise against it. He's also told me he has advised you you have a right to remain silent and not testify and that would not be held against you. He further tells me that you have chosen to not testify in this matter. Again you need not comment. If you choose not to comment, I will assume that what he says is true but you may comment if you like.
> DEFENDANT SHAIN DUKA:  That's true, I won't testify.
> THE COURT:  Thank you, sir.

(Trial Tr. 6018-23)

Ultimately, a jury found Dritan and Shain Duka guilty of the following:  (1) conspiracy to murder members of the United States military, (2) possession or attempted possession of firearms in furtherance of a crime of violence; (3) possession of machineguns; and (4) possession of firearms by an illegal alien. Both Dritan and Shain Duka received a life sentence. Eljvir Duka was convicted by a jury of conspiracy to murder members of the United States military and possession of firearms by an illegal alien. He was also sentenced to life imprisonment. The jury found the Dukas not guilty of attempt to murder members of the United States military and found Eljvir Duka not guilty of possession or attempted possession of firearms in furtherance of a crime of violence. The United States Court of Appeals for the Third Circuit affirmed the judgment and conviction as to the Dukas on December 28, 2011. *See United States v. Duka*, 671 F.3d 329 (3d Cir. 2011).

Subsequently, the Dukas filed their § 2255 motions in June, 2013.[1] The Dukas raised numerous claims that this Court analyzed and denied on September 30, 2015 with the exception

---

[1] At the time that the Dukas filed their § 2255 motions, they were proceeding *pro se*. Subsequently, in October, 2013, attorney Robert Joseph Boyle, Esq. entered a notice of appearance and began representing of each of the Dukas on their § 2255 motions. Indeed, in February, 2014, Mr. Boyle filed a joint memorandum of law in support of each of their § 2255 motions. After this matter was fully briefed, but prior to any decision on their claims, Dritan and

of one claim. This Court did not rule on the Dukas' claim that they were denied the right to testify at trial due to attorney coercion, and, therefore, did not voluntarily waive their right to testify in their own defense. The Dukas each submitted declarations in support of this claim. This Court's September 30, 2015 Opinion outlined each of the Dukas' declarations that they submitted in support of their claim as follows:

> Shain Duka filed a declaration whereby he states that he told his attorney, Mr. Michael Riley, Esq., before and during his trial that he wanted to testify. However, near the end of the trial, Shain Duka recalls that the attorneys that represented him and his brothers told them that "not only should [they] not testify, they were not prepared to put any of [them] on the stand." (*See* Dkt. No. 14 at p. 6.) Shain Duka also declares that [h]ad I thought that my lawyer was prepared, I would have insisted on taking the witness stand[.]" (*Id.*)

> Eljvir Duka's filed declaration is even more specific than Shain's as he states as follows:

>> After the government rested its case, there was a meeting in the courthouse attended by my co-defendants and all the lawyers. I stated that I wished to testify. Mr. Archie [Eljvir's trial counsel] stated that I should not and that in any event he was not prepared to put me on the stand. I still wished to testify and told Mr. Archie so. However, over the course of the meeting, I came to the conclusion that Mr. Archie was not prepared and because of that I would probably hurt my chances if I testified. It is for that reason that I told the Court that I decided not to testify.

> (Dkt. No. 15 at p. 1.) Dritan Duka also recounts the purported coercion he felt from his counsel not to testify:

>> It was between 3–6 months before the start of trial that I told my attorney Michael Huff that I wanted to testify. He initially was not opposed. However, during a legal visit some time prior to trial, he asked

---

Eljvir Duka obtained new counsel to represent them; specifically Chad Lathrop Edgar, Esq. and Charles Davidson Swift, Esq. respectively. Mr. Boyle has remained as Shain Duka's counsel of record.

> me some more questions that may be posed on cross
> examination. I do not recall specific questions only
> that they concerned my belief in a Muslim's jihad
> obligation. Mr. Huff told me that based on my
> answers the jury would likely think I was an
> extremist and convict me. At the conclusion of that
> meeting I had not changed my mind and still
> wanted to testify.
>
> We did not discuss the issue of my testimony again
> until after the Government concluded its case. I
> recall a meeting where all of the defendants and
> lawyers were present. Mr. Huff told me that I
> should not testify. I stated that I still wanted to do
> so. He added that he was not prepared to put me on
> the stand and that if I took the stand it would hurt
> the case.
>
> I only agreed with his decision because he told me
> that he was not prepared and I felt that if he was
> unprepared my taking the stand would do more
> harm than good. It was for that reason that I told the
> Court that I chose not to testify.
>
> Mr. Huff never informed me, nor was I aware that I
> could have overruled his decision and testified even
> if he thought it was a bad idea. Had I known that I
> would have as [sic] asserted that right and requested
> that Mr. Huff request some time to prepare me.

(Dkt. No. 16 at p. 9.)

*Duka*, 2015 WL 5768786, at *4-5. The government in turn submitted declarations from the

Dukas' trial counsel. This Court summarized the government's arguments in response to the

Dukas' claim as follows:

> The government responds in opposition to this claim by initially
> citing to this Court's colloquy it had with the Dukas at trial
> regarding their right to testify. The government argues that the
> Dukas have now contradicted the assurances they gave the Court
> during trial regarding giving up their right to testify. It further
> claims that the Dukas provide no explanation why their attorneys
> would undertake such grievous professional misconduct. In
> support of its position, the government has attached the

6

> declarations of the Dukas' trial counsel. These three attorneys all
> state that they informed the Dukas of their right to testify and that
> they never told them that they were unprepared to place them on
> the witness stand.

*Id.* at *5. At the time of the September 30, 2015 Opinion, this Court could not rule on the claim

because "the record and files do not conclusively show that the Dukas are not entitled to federal

habeas relief on this claim." *See Duka*, 2015 WL 5768786, at *6.

An evidentiary hearing took place on the remaining claim on January 6, 2016. At that

hearing, each of the Dukas testified in support of their claim that their attorneys coerced them

into waiving their right to testify at trial. Additionally, Mr. Huff, Mr. Archie and Mr. Riley

testified as well. During the course of that hearing, some of the parties requested that they be

permitted to submit written summations to the evidence that this Court received at the hearing.

This Court granted that request. Written summations were submitted by the parties on February

29, 2016. This Court is now prepared to rule.

### III.   LEGAL STANDARD

The Dukas collectively claim that their decision not to testify was the result of attorney

coercion.

> The Supreme Court has held that the right to "testify on one's own
> behalf at a criminal trial" is grounded in three provisions of the
> Constitution. *Rock v. Arkansas,* 483 U.S. 44, 51, 107 S. Ct. 2704,
> 97 L. Ed. 2d 37 (1987); *see also United States v. Van De Walker,*
> 141 F.3d 1451, 1452 n.1 (11th Cir. 1998) (acknowledging that
> right to testify is constitutional), *cert. denied,* 525 U.S. 912, 119 S.
> Ct. 257, 142 L.Ed.2d 211 (1998); *Brown v. Artuz,* 124 F.3d 73, 76
> (2d Cir. 1997) (same), *cert. denied,* 522 U.S. 1128, 118 S. Ct.
> 1077, 140 L. Ed. 2d 135 (1998); *Ortega v. O'Leary,* 843 F.2d 258,
> 261 (7th Cir. 1988) (same). First, the "Fourteenth Amendment's
> guarantee that no one shall be deprived of liberty without due
> process of law include[s] a right to be heard and to offer
> testimony." *Rock,* 483 U.S. at 51, 107 S. Ct. 2704; *see also United
> States ex rel. Wilcox v. Johnson,* 555 F.2d 115, 118 (3d Cir. 1977)
> (right to testify "emanate[s] from the due process requirements of

the Fourteenth Amendment") (citation omitted). Second, the right to testify also derives from the Compulsory Process Clause of the Sixth Amendment, "which grants a defendant the right to call 'witnesses in his favor.'" *Rock,* 483 U.S. at 52, 107 S. Ct. 2704 (quoting *Washington v. Texas,* 388 U.S. 14, 17–19, 87 S. Ct. 1920, 18 L. Ed. 2d 1019 (1967)). At times, "the most important witness for the defense ... is the defendant himself." *Id.* Finally, the right to testify is protected by the Fifth Amendment's guarantee against compelled testimony. *Id.* That is, the privilege to refuse to testify is part and parcel of the privilege to testify if one wishes to do so. *Id.* at 53, 107 S. Ct. 2704.

The right is personal and can be waived only by the defendant, not defense counsel. [*United States v.*] *Pennycooke,* 65 F.3d [9,] 10 [(3d Cir. 1995)]; *Johnson,* 555 F.2d at 118 (observing that right to testify "can be waived only by the defendant and not by his attorney") (internal quotation marks and citation omitted); *Emery v. Johnson,* 139 F.3d 191, 198 (5th Cir. 1997) ("This right [to testify] can be waived only by the defendant, not by his counsel."), *petition for cert. filed,* (U.S. Jul. 13, 1998) (No. 98–5802); *Brown,* 124 F.3d at 77 ("[E]very circuit that has considered this question has placed the defendant's right to testify in the 'personal rights' category—i.e., waivable only by the defendant himself regardless of tactical considerations.") (citations omitted); *Ortega,* 843 F.2d at 261 ("If a defendant insists on testifying, no matter how unwise such a decision, the attorney must comply with the request.") (citation omitted). If a defendant does waive this right, the waiver must be knowing, voluntary and intelligent. *Pennycooke,* 65 F.3d at 11; *Emery,* 139 F.3d at 198; *Ortega,* 843 F.2d at 261.

*United States v. Leggett*, 162 F.3d 237, 245-46 (3d Cir. 1998) (footnote omitted).

Where a petitioner claims that his attorney was ineffective by denying him the right to testify, the *Strickland* standard is used to analyze the claim. *See Palmer v. Hendricks*, 592 F.3d 386, 394 (3d Cir. 2010) (citations omitted). In *Strickland v. Washington,* 466 U.S. 668 (1984), the Supreme Court articulated a two-prong test for demonstrating when counsel is deemed ineffective. First, the petitioner must show that considering all of the circumstances, counsel's performance fell below an objective standard of reasonableness. *See id.* at 688; *see also Grant v. Lockett,* 709 F.3d 224, 232 (3d Cir. 2013) (noting that it is necessary to analyze an

ineffectiveness claim in light of all of the circumstances) (citation omitted). A petitioner must identify the acts or omissions that are alleged not to have been the result of reasonable professional judgment. *See Strickland,* 466 U.S. at 690. Under this first prong of the *Strickland* test, scrutiny of counsel's conduct must be "highly deferential." *See id.* at 689. Indeed, "[c]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690. The reviewing court must make every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. If counsel makes "a thorough investigation of law and facts" about his plausible options, the strategic choices he makes accordingly are "virtually unchallenceable." *Gov't of Virgin Islands v. Weatherwax,* 77 F.3d 1425, 1432 (3d Cir. 2006) (citing *Strickland,* 466 U.S. at 690–91). If, on the other hand, counsel pursues a certain strategy after a less than complete investigation, his choices are considered reasonable "to the extent that reasonable professional judgments support the limitations on investigation." *Rolan v. Vaughn,* 445 F.3d 671, 682 (3d Cir. 2006) (citing *Strickland,* 466 U.S. at 690–91).

The second prong of the *Strickland* test requires the petitioner to affirmatively prove prejudice.[2] *See* 466 U.S at 693. Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id.*; *see also McBridge v. Superintendent, SCI Houtzdale,* 687 F.3d 92, 102 n.11 (3d

---

[2] This Court limited the January 6, 2016 evidentiary hearing to issues associated with the first prong of the *Strickland* analysis. For the reasons discussed *infra,* because the Dukas have not satisfied their burden to show that their counsel's performance fell below an objective standard of reasonableness, this Court need not and will not analyze their claim under the prejudice prong of *Strickland.*

Cir.2012). "This does not require that counsel's actions more likely than not altered the outcome, but the difference between *Strickland's* prejudice standard and a more-probable-than-not standard is slight and matters only in the rarest case. The likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter,* 562 U.S. 86, 111–12 (2011) (internal quotation marks and citations omitted).

A petitioner must prove his allegations that his attorney was constitutionally ineffective in a § 2255 proceeding by a preponderance of the evidence. *See Pough v. United States*, 442 F.3d 959, 964 (6th Cir. 2006) (citing *McQueen v. United States*, 58 F. App'x 73, 76 (6th Cir. 2003) (unpublished); *Wright v. United States*, 624 F.2d 557, 558 (5th Cir. 1980)); *see also Demar v. United States*, 228 F. App'x 940, 950 (11th Cir. 2007) (Section 2255 petitioner has burden to show by a preponderance of the evidence that counsel's performance was unreasonable); *Randle v. United States*, 954 F. Supp. 2d 339, 349 (E.D. Pa. 2013) (Section 2255 petitioner has burden of proving ineffective assistance of counsel claims by a preponderance of the evidence) (citations omitted); *United States v. Sacksith*, Civ. No. 08-4620, 2010 WL 2270983, at *7 (E.D. Pa. June 3, 2010) (same).

As explained *infra*, the Dukas and their trial counsel completely contradict each other over what transpired regarding the Dukas waiving their right to testify at trial. The Dukas all testified that they wanted to testify, but were compelled and coerced into stating during the testimonial waiver colloquy that they chose not to testify. According to the Dukas, their trial attorneys forced their hands by telling them immediately prior to the colloquy that they were each unprepared to put them on the stand. The trial attorneys, however, all indicate that they told the Dukas that the decision of whether they wanted to testify was up to them and that they never told them that they were unprepared to put them on the witness stand. Because of these divergent

recitation of the facts by the witnesses, the claim hinges on which witnesses this Court finds credible (or which witnesses this Court finds not credible).

In assessing the credibility of the witnesses, this Court will be guided by several factors such as:

> (1) The opportunity and ability of the witness to see or hear or know the things about which the witness testifies;
> (2) The quality of the witness knowledge and understanding, and memory;
> (3) The witness appearance, behavior, and manner while testifying;
> (4) Whether the witness has an interest in the outcome of the case or any motive, bias, or prejudice;
> (5) Any relation the witness may have with a party in the case and any effect that the [outcome] may have on the witness;
> (6) Whether the witness said or wrote anything before [his testimony] that is different from the witness testimony in court;
> (7) Whether the witness testimony is consistent or inconsistent with other [believable] evidence. . . and
> (8) Any other factors that bear on whether the witness should be believed. Inconsistencies or discrepancies in a witness testimony or between the testimony of difference witnesses may or may not cause [one] to disbelieve that witness testimony.

Third Circuit Model Crim. Jury Instructions § 1:10.

## IV.    DISCUSSION

Before turning to the issue of whether any of the Dukas have satisfied their burden, this Court will highlight certain aspects of each witness' testimony from the January 6, 2016 evidentiary hearing.

### A.    Dritan Duka's § 2255

#### i.    *Dritan Duka Testimony*

Dritan Duka testified that he had several arrests prior to his arrest in this case but none led to a trial and none involved a discussion of his rights as a criminal defendant. (*See* Evid. H'rg 10, Jan. 6, 2016) Dritan Duka testified that he never recalled Mr. Huff discussing what rights a

criminal defendant has. (*See id.* 11) Dritan told Mr. Huff that he wanted to testify. (*See id.* 12) At some point, Mr. Huff conducted a five minute mock cross examination. (*See id.* at 12-13) At the end of that five minute mock session, Dritan testified that Mr. Huff "put his pen down in like a dramatic way, and he told me, you can't testify, being an extremist and a radical." (*See id.* 13) Dritan stated that he disagreed with Mr. Huff's comments, but that no final decision was made on whether he would testify at that time. (*See id.*)

Dritan Duka also discussed another meeting where Shain Duka's counsel, Mr. Riley, was present (Dritan could not recall whether Mr. Huff was also at this meeting).[3] (*See id.* 14) At that meeting, the attorneys suggested that it would be better if only Shain took the stand since he had less inflammatory statements on the audiotapes. (*See id.*) However, Dritan Duka testified that he expressed his disagreement with the defense team on this point of view because "the jury wants to hear what the person, the person that made the statement has to say. My brother can't explain why I said that." (*See id.* 15) Dritan explained that he thought no final decision on whether he would testify was made that day. (*See id.*)

Dritan Duka also testified about a meeting that he and his co-defendants had with their attorneys immediately prior to the testimonial waiver colloquy conducted on December 9, 2008. At that meeting, Dritan stated that he and his two brothers agreed they were going to testify and told each of their attorneys as such. (*See id.* 16) However, according to Dritan, Mr. Huff kept insisting that it was not a good idea for him to testify. (*See id.*) Furthermore, Dritan stated Mr. Huff told him that he was not prepared to put him on the witness stand. (*See id.* at 17) Dritan explained that he was in shock by this statement from Mr. Huff, and that, upon speaking to his brothers, their attorneys had said the same thing (i.e., the attorneys were not prepared to put them

---

[3] The five co-defendants had a joint defense agreement.

on the witness stand). (*See id.*) According to Dritan, it was at that point that he and his brothers came to the conclusion that they had no alternative but to not take the stand. Dritan came to this conclusion because Mr. Huff stated he was unprepared. (*See id.* 18) Thus, Dritan explains that this was the reason that he told the Court during the colloquy that he chose not to testify. (*See id.*)

In responding to questions during cross with respect to the meeting with the attorneys that took place immediately prior to the December 9, 2008 testimonial waiver colloquy, Dritan explained that the size of the room they were in was relatively small. (*See id.* 43) However, despite its small size, Dritan explained that everyone would not be able hear everything that was being said in the room. (*See id.*)

With respect to the actual testimonial waiver colloquy, Dritan stated that he was still in shock by Mr. Huff's statement that he was not prepared and that he did not remember hearing everything during the colloquy. (*See id* 18.) He noted that he thought that the colloquy was just a formality. (*See id.*)

Dritan was also questioned as to why he did not complain to this Court during the colloquy that his attorney told him that he was not prepared. (*See id.*) Dritan then referenced a time he did try to complain to this Court about his attorney, but, according to Dritan, he:

> [r]eally didn't get a chance to express all the issues, I kept getting cut off, and ultimately was told that I should listen to my attorney and that he makes the final decisions for me. And I thought there was no – I already turned to him for help. I didn't – there was no use of doing that.

(*See id.* 18-19)

During cross-examination, Dritan explained that he "zoned out" at times during the testimonial waiver colloquy. (*See id.* 20) Later on, Dritan reiterated this point by stating that he did not pay attention to the colloquy between himself and this Court. (*See id.* at 26).

    ii.    *Michael Huff Testimony*

Mr. Huff was the next witness to testify at the January 6, 2016 evidentiary hearing. He testified that he has twenty-one years of practice as an attorney and that he has taken numerous criminal trials to a jury verdict in both state and federal court. (*See id.* 56) Mr. Huff stated that he told Dritan Duka that Dritan had the final decision about whether he should testify in his own defense or not. (*See id.* 57) Mr. Huff further stated that he told Dritan that his role was to tell him the positives and negatives of whether he should testify or not. (*See id.* 58) Mr. Huff explained that he never told Dritan that he was not prepared to call him as a witness and Dritan never told him that he had decided that he wanted to testify. (*See id.* 55, 56) When asked, Mr. Huff testified that had Dritan told him that he wanted to testify, he would have been prepared to put him on the stand. (*See id.* 56)

Mr. Huff testified as to the reasons he believed that it was not a good idea for Dritan to take the stand in his own defense. Mr. Huff explained that he believed that the jury would not react favorably to his beliefs (*see id.* 66) and that him taking the stand would mean that the jury would have to relive all of the damaging audiotapes over again. (*See id.* 67-68)

Mr. Huff was also questioned about whether he had heard any of the defendants say at any point that they wanted to testify. (*See id.* 72) Mr. Huff responded, "Definitively, no." (*See id.*) Furthermore, Mr. Huff explained that had he heard any of the defendants state that they wanted to testify, he would have discussed it with his co-counsel. (*See id.*)

Mr. Huff also testified about the meeting that took place between the defendants and counsel immediately prior to the testimonial waiver colloquy on December 9, 2008 in the marshals' cellblock behind the courtroom. Mr. Huff has a different recollection than Dritan of what transpired at that meeting. Mr. Huff testified that Dritan told him at that meeting that he did not want to testify and that Dritan never told him that the jury has to hear what he wants to say. (*See id.* 80, 81)

During cross-examination, Mr. Huff was also questioned about the previous hearing referenced by Dritan Duka in his testimony where he said he was not allowed to present all of the issues he was having with Mr. Huff and that he was cut off. Mr. Huff explained that Dritan understood after that hearing that *motion practice* is left up to the discretion of the attorney. (*See id.* 109) Mr. Huff also testified that he did not have a written direct examination prepared in his trial notebook for Dritan. (*See id.* 135) However, Mr. Huff explained that this was done orally. (*See id.*)

iii.   *Analysis of Dritan Duka's Claim*

Because Dritan Duka has the ultimate burden to prove his claim by a preponderance of the evidence, this Court must analyze his credibility. Ultimately, for the foregoing reasons, this Court does not find Dritan Duka's testimony to be credible on the facts surrounding Mr. Huff's purported ineffectiveness.

Dritan Duka testified at the evidentiary hearing that he never recalled Mr. Huff discussing his rights as a criminal defendant. Furthermore, he testified that he told Mr. Huff that he wanted to testify immediately prior to the December 9, 2008 colloquy, but that Mr. Huff told him that he was unprepared, leaving Dritan in a state of shock during the colloquy itself.

Dritan Duka's testimony at the evidentiary hearing is directly contradicted by what this Court heard at the testimonial waiver colloquy. Indeed, Dritan Duka was present when this Court questioned Mr. Huff at that colloquy whether he had explained to his client that he had the absolute right to testify and that Mr. Huff could not stop him from testifying if that is what Dritan wanted to do. Dritan Duka was also present when Mr. Huff answered in the affirmative and also present when Mr. Huff told this Court that Dritan's *decision* was not to testify. Dritan Duka did not object to these statements by Mr. Huff at the colloquy that Dritan now states were factually incorrect despite being present during Mr. Huff's statements to this Court.

However, this Court did not only question Mr. Huff on whether Dritan wanted to testify. In addition, this Court posed the questions directly to Dritan Duka too. To reiterate, this Court specifically questioned Dritan Duka whether his attorney had advised him that he had the right to testify and that his attorney could not stop him from testifying. Dritan Duka told this Court that he had.

Dritan Duka's earlier statements to this Court during the testimonial waiver colloquy at trial contradict what Dritan Duka is now telling this Court several years later in this § 2255 proceeding. His inconsistent statements are an important factor in this Court's finding that Dritan Duka is not credible on the issue of whether Mr. Huff coerced Dritan and was ineffective. Furthermore, as he has now been convicted and sentenced to life imprisonment, Dritan Duka has a strong motive to lie that was not present when he spoke before this Court during the colloquy in 2008. Nevertheless, this Court must also closely examine the reasons that Dritan Duka gave during his testimony in his attempt to explain his actions and statements he made at the testimonial waiver colloquy.

As previously stated, Dritan Duka testified at the evidentiary hearing that he was in shock Mr. Huff told him immediately prior to the testimonial waiver colloquy that he was not prepared to put him on the stand. Indeed, Dritan Duka testified that he "zoned out" at certain moments of the colloquy. However, the transcript of the colloquy has no indication that Dritan Duka "zoned out." Importantly, when this Court spoke to Dritan at the colloquy regarding whether his attorney had advised him about his absolute right to testify, this Court left it up to Dritan Duka whether he wanted to respond. Indeed, after advising Dritan of his absolute right to testify, this Court noted that it would take Dritan Duka's silence as an assumption that what the Court just told Dritan about whether his attorney had so advised him was correct. (*See* Trial Tr. 6022) Rather than remain silent, which would have been expected if Dritan Duka was "zoning out" during the colloquy, Dritan Duka did not remain silent. Instead, he *affirmatively stated* that Mr. Huff had advised him that he had an absolute right to testify, that Mr. Huff could not stop him from testifying and that it was his *choice* not to testify (*See id.*) Thus, this Court is skeptical of Dritan Duka's "zoning out" rationale as a reason for how Dritan Duka acted and answered during the colloquy.

Dritan Duka has also presented this Court with another rationale in attempting to explain why he did not speak up against Mr. Huff at the colloquy. Indeed, Dritan references a prior instance where he purportedly was not permitted to present all of his issues, was cut off from speaking and was told that he should listen to his attorney who makes all of the final decisions for him. (*See* Evid. Hr'g 19) This incident occurred at a pretrial hearing on June 5, 2008. The transcript of that incident though is not consistent with Dritan's testimony in this § 2255 proceeding. Indeed, the transcript from that hearing is as follows:

> MR. HUFF:  . . . I've had an opportunity to speak with my client
> Dirtan Duka this morning, Judge and he would like one or two

minutes to have a conversation with your Honor, as well as present you with some paperwork. I have told him, Judge, that I didn't believe that's proper, that he's represented by counsel, that I am the one that should speak for him. [¶] In addition to that, your Honor, I think the topic he wants to bring up is a topic that's presently under seal with the Court. But, I will present the Court, I guess, with the opportunity – or present my client with the opportunity. If the Court would like to hear from him, he would like to speak with the Court.

THE COURT:  Do you know what he's going to say?

MR. HUFF:  I have an idea, yes.

THE COURT:  Well. And have you advised him whether you think he should say it or not in public?

MR. HUFF:  It is not something I think he should bring up in public, your Honor.

THE COURT:  Well, do me a favor, would you go talk to him right now again?

MR. HUFF:  May I, Judge.

THE COURT:  Yes.

(Short pause. Mr. Huff speaking with Dritan Duka).

MR. HUFF:  Judge, if I may, there is a motion that my client would like to submit to the Court that he would like to inform the Court that he has asked me to file this motion and that I have not filed that on his behalf, that's what he wants me to tell you.

THE COURT:  Have you read the motion?

MR. HUFF:  I'm just being handed it right now, Judge, but I know what the contents are.

THE COURT:  Read it and make sure because normally I don't accept motions from defendants who are represented by counsel.

DEFENDANT DRITAN DUKA:  I understand that, but I have told him and he hasn't done it. This is the only reason why I did it myself.

MR. HUFF:  And, Judge, I explained to him that I'm his attorney and ultimately as his attorney I get to make those final decisions as to which motions are proper, which motions are improper and that ultimately if he wanted to file his own motions, he'd have to make an application with the Court to go *pro se*.

THE COURT:  Well, having reviewed the motion – because if he sends it, in it's going to be public.

MR. HUFF:  I know that and he knows that, Judge.

THE COURT:  And is it something that you don't think –

MR. HUFF:  It's something that under seal, Judge, so it's improper right from the beginning.

THE COURT:  So you don't think it's in his best interests at this point?

MR. HUFF:  No, I do not, Judge. I will further discuss it with him, though, I can promise the Court and my client that.
DEFENDANT DRITAN DUKA:  Yes, I will discuss it with him. I just want to put on the record that we don't have like other conflicts with other stuff like our relationship –
MR. HUFF:  Otherwise, we're the best of friends.
DEFENDANT DRITAN DUKA:  I've been telling him this long and he doesn't done it and I believe it's really important to me, but will discuss the issue further and we'll take it from there hopefully.
THE COURT:  You need to understand that he is your lawyer and he gets to make the final decision.
DEFENDANT DRITAN DUKA:  I understand, I understand, but I believe he's got – there is certain things – I know he knows the law and he's more educated than me, but I think – I think there is certain things I know which are beneficial to me also and I believe in that respect he should hear me out and then accept some of the issues I have and then to put it out there.
THE COURT:  Well, you may think at this point it's beneficial to you, but I think your counsel has a much better view of the larger picture of what's going on in the case and everything else and it may not in fact turn out to be beneficial to you –
DEFENDANT DRITAN DUKA:  I understand.
THE COURT:  -- to raise this issue, whatever it is, publicly.
DEFENDANT DRITAN DUKA:  I understand. But like I say, we will discuss it further and we'll take it from there. I apologize for any inconvenience.
THE COURT:  Just listen to your attorney, he gets to make the final discussion. [sic]
DEFENDANT DRITAN DUKA:  Okay.
THE COURT:  Anything you send me outside of him is going to immediately become public.
DEFENDANT DRITAN DUKA:  I know that. I am aware of that.
THE COURT:  All right.
DEFENDANT DRITAN DUKA:  Thank you.
MR. HUFF:  Thank you, Judge.
THE COURT:  All right.

(Tr. 16-20, June 5, 2008) Relying on what transpired at that hearing, Dritan Duka argues that there was no longer any point in turning to Mr. Huff for help when he purportedly told him he was unprepared to put him on the stand and that he had to listen to his attorney who makes the final decisions for him. However, this Court does not find Dritan Duka's argument credible on this point. First, as previously indicated, during the colloquy, this Court specifically instructed

and notified Dritan Duka that the decision of whether he should testify was his alone to make. Indeed, Dritan Duka affirmatively acknowledged this point at the colloquy. Second, the June 5, 2008 hearing recited above only indicated a discussion of whether Dritan Duka or his counsel, Mr. Huff, had the final decision of whether to file a *motion*, not who had the final decision of whether Dritan Duka was going to testify. Any potential confusion on this point by Dritan would have been resolved by this Court's careful and clear statements and questioning during the testimonial waiver colloquy.

Dritan Duka also argues that this Court did not allow Dritan Duka the chance to express all of his issues at the June 5, 2008 hearing. Thus, it appears that Dritan Duka is arguing that there was no point to argue to this Court that Mr. Huff had purportedly told him that he was unprepared to put him on the witness stand. This argument by Dritan Duka that this Court failed to consider the issues he presented to the Court is belied by the record. Indeed, as the transcript from June 5, 2008 indicates, this Court in no way prevented Dritan Duka from presenting his arguments to this Court. Dritan Duka noted at that hearing that he would simply discuss the matter further with his attorney.

Dritan Duka's argument that this Court prevented him from presenting all of his issues at the June 5, 2008 hearing and therefore did not speak up during the colloquy is also not credible for another reason. Indeed, as was alluded to at the January 6, 2016 evidentiary hearing, this Court gave the defendants' complaints in this case due consideration. For example, this Court took the somewhat unique step of visiting the Federal Detention Center in Philadelphia (where the Dukas were detained prior to trial) after the Dukas complained about their access to discovery during the pretrial process. (*See id.* 30) Upon inspection, this Court set up a special room for the five co-defendants and their counsel to have access to at the detention center with a

computer available so that discovery could be reviewed. Thus, Dritan Duka's claim that he felt stifled by this Court, is not supported by the record in this case in light of how this Court responded to the defendants complaints and issues raised during the course of the criminal proceedings.

Compared to Dritan Duka's testimony, this Court finds Mr. Huff's testimony more credible.  At the time of trial, Mr. Huff had approximately thirteen years of experience as an attorney.  Mr. Huff's testimony does not have the same contradictions as does Dritan Duka's testimony. Mr. Huff's January 6, 2016 evidentiary hearing testimony is consistent with what he told this Court during the testimonial waiver colloquy. More specifically, on both occasions, Mr. Huff told this Court that he explained to Dritan Duka that the ultimate decision on whether he was to testify or not was his to make and that he decided *not* to testify.

Upon hearing both Dritan Duka and Mr. Huff testify, this Court finds that Dritan Duka's testimony is not credible as it relates to Mr. Huff's purported ineffectiveness. Therefore, Dritan Duka has failed to meet his burden on his claim that his decision not to testify was the result of attorney coercion. Accordingly, the claim will be denied.

B.  Eljvir Duka's § 2255

i.    *Eljvir Duka's Testimony*

Eljvir Duka testified at the evidentiary hearing that Mr. Archie never went over what his rights were going to be at trial. (*See id.* 152) However, Eljvir expressed to Mr. Archie a desire to testify. (*See id.* 154) Indeed, he stated that while reviewing the statements that were purportedly going to be used against him during the pretrial period, he felt he had a need to explain them to the jury. (*See id.* 152)

Eljvir was questioned about the December 9, 2008 meeting he had with his co-defendants and counsel immediately prior to the testimonial waiver colloquy. Eljvir testified that this meeting took about fifteen minutes. (*See id.* 159) Eljvir stated that he told Mr. Archie at that meeting that he wanted to take the stand. (*See id.* 157) However, "[Mr. Archie] said I'm not ready to put you on the stand. And I said, Troy, like I need to take the stand. The jurors, they're not understanding my statements. And he says, well, I'm not, I'm not, I'm – he really didn't have much words that day." (*See id.* 157-58) Later on during his testimony, Eljvir stated that Mr. Archie told him at this meeting that he was not prepared to put him on the stand. (*See id.* 160) This meeting with Mr. Archie made Eljvir feel "done." (*See id.* 158) Eljvir also testified that Mr. Archie gave him instructions at this meeting on how he should handle this Court's upcoming colloquy. More specifically, Eljvir explained that Mr. Archie told him to tell this Court during the colloquy that he did not want to testify. (*See id.* 160) According to Eljvir, at no point did Mr. Archie ever explain to him that he could have asked for a continuance. (*See id.*) Eljvir also stated that he would have made a different decision had he known there was a possibility that things could have been delayed. (*See id.* 160-61)

Eljvir was also questioned about the responses he gave during the testimonial waiver colloquy. According to Eljvir, he responded to this Court's questions by stating that he did not want to testify because, "when I expressed to Troy I wanted to testify, when he told me, I'm not prepared to put you on the stand, I felt, like I said, at that moment, I felt done, you understand? I had no other means. And so when he told me that, I figured this is my situation right now." (*See id.* 160)

Eljivr also testified about a conversation he had with Mr. Archie after trial, but prior to sentencing. Eljvir explained what Mr. Archie told him at that meeting, specifically:

> [Mr. Archie] came, and when he came into that meeting he said –
> he basically came and said listen, basically we got to go to
> sentencing now. And in that meeting he told me, he said listen, I
> messed up. And he said listen, if it takes me to get on the stand and
> tell the Court that I messed up, he said I'll do it. He said because
> I've done it before when I first started working as a lawyer, he said
> I had this client where basically I messed up his case, I was new.
> And he said I went to the Supreme Court and I went on the stand
> and I told them that it was my fault, I messed up.

(*See id.* 161) Eljvir was also questioned about a letter he wrote to Mr. Archie after he filed his §

2255 motion that Eljvir stated included references to this conversation he had with Mr. Archie

prior to sentencing. That letter, dated December 17, 2013, states as follows:

> How are you doing Troy? Troy! I wish to keep it short. You know
> how it is.
> "We here now!" I actually thought it might come to this though we
> knew I'm innocent."
> Haven't you been here before? Supreme Court? Near when you
> first started? Good deed!" "Good deeds don't go to waste!"
> You were the one you know we kept it real with. We tried to win it
> on trial knowing we're innocent, but the prejudice was hard to
> overcome.
> Now we can with the ball in your court again! Tell Hiram I said
> what's up. It's not only him! I can possibly be a paralegal for you
> too "if I gain the same experience as him!" (Ha Ha)
> I was thinking a legal call would be good so I can discuss some
> legal issues with you. Have you read my 2255 motion? Let me
> know if you want it.
> I think they want to interview you. I don't know if you know this
> yet or not. Hook it up, Troy. I'm innocent and this is what it's
> come to. We know it's wrong what they did. "Yet it was all your
> fault Troy." "[A]nd we know this man."

(Gov't Ex. 1405) According to Eljvir, he wrote this letter to Mr. Archie in 2013 to tell him, "just

like whatever happened in the other case, as you told the courts how you messed up in that other

case, I want you to do the same here and be honest." (Evid. Hr'g 162) Despite Eljvir stating that

this was his intent in writing this letter in 2013, Eljvir also stated that Mr. Archie did not explain

to him how he "messed up" in that other case. (*See id.* 161)

During cross-examination, Eljvir reiterated that he told Mr. Archie a few times that he wanted to testify. (*See id.* 172) However, despite the fact that Eljvir admitted during cross-examination that Mr. Archie was prepared during other aspects of the trial, he told him at the December 9, 2008 meeting that he was unprepared to put him on the witness stand. (*See id.* 172, 173) Eljvir also stated that he heard Mr. Riley, Shain Duka's trial attorney, tell him at the December 9, 2008 meeting that he was unprepared to put Shain on the stand. (*See id.* 174)

With respect to the December, 2013 letter he sent to Mr. Archie, Eljvir testified on cross that he waited until that time to raise the issue of the conversation he had with Mr. Archie prior to sentencing where Mr. Archie told him he "messed up" because that was when he filed his § 2255 motion. (*See id.* 181)

ii.    *Troy Archie Testimony*

Mr. Archie testified that he has been an attorney for eighteen years as of the January 6, 2016 evidentiary hearing. (*See id.* 192) He testified that he told Eljvir that it was his decision whether he wanted to testify or not. (*See id.* 193-94) He further explained that he never told Eljvir that he was not prepared to call him as a witness. (*See id.* 191) Furthermore, Mr. Archie noted that Eljvir never told him shortly before or after the government rested its case that he wanted to testify and that Eljvir never told him that he had made up his mind and wanted to testify. (*See id.* 191)

According to Mr. Archie, he spoke to Eljvir about the pros and cons of testifying. (*See id.* 194) Mr. Archie had concerns about Eljvir testifying based on his beliefs in Islamic law. (*See id.* 203) Nevertheless, had Eljvir told him at the December 9, 2008 meeting that he wanted to testify, Mr. Archie explained that he would have probably asked for a one or two day break prior to

putting Eljvir on the witness stand. (*See id.* 195) However, Mr. Archie reaffirmed that no one said that they wanted to testify at the December 9, 2008 meeting (*See id.* 206)

Mr. Archie was also questioned about the purported conversation that Eljvir discussed during his testimony that he had with him prior to sentencing where Mr. Archie told Eljvir that he "messed up." According to Mr. Archie, that conversation never happened. (*See id.* 192) With respect to Eljvir's December 2013 letter, Mr. Archie stated that he did not say to Eljvir that it was "all his fault" and took Eljvir's statement to "hook it up" to mean that he should fall on his sword for his former client and perjure himself to support Eljvir's § 2255 claims. (*See id.* 229, 235)

During cross-examination, Mr. Archie testified that had Eljvir wanted to testify, he could have used a timeline that he created as a way to proceed in questioning Eljvir, but that there was not an ongoing theme that Eljvir wanted to testify.[4] (*See id.* 219) Mr. Archie stated that he always told Eljvir that he had the absolute right to testify but that it was his professional opinion that he not testify. (*See id.* 220) Indeed, Mr. Archie stated that he was concerned that if Eljvir testified, one audio recording that was not introduced by the government that tied Eljvir to the purchase of the guns by his brothers could have potentially been introduced against him on cross-examination. (*See id.* 221, 224)

   iii.   *Analysis of Eljvir Duka's Claim*

Because Eljvir Duka has the burden to establish that he is entitled to relief on his claim by a preponderance of the evidence, this Court will analyze his credibility. This Court does not find Eljvir Duka's testimony to be credible as it relates to Mr. Archie's ineffectiveness. Eljvir Duka testified that Mr. Archie never went over what his rights were at trial. Furthermore, Eljvir

---

[4] Mr. Archie's timeline was provided to this Court at the evidentiary hearing and marked as Eljvir Duka Ex. 1.

Duka stated that he told Mr. Archie at the December 9, 2008 meeting immediately prior to the testimonial waiver colloquy that he wanted to take the stand. According to Eljvir Duka, Mr. Archie told him, however, that he was not prepared to put him on the stand. This made Dritan Duka feel "done" during the colloquy itself.

Eljvir Duka's testimony at the evidentiary hearing is directly contradicted by what this Court heard from him at the testimonial waiver colloquy. Eljvir Duka was present when this Court questioned Mr. Archie at that colloquy whether he had explained to his client that he had the absolute right to testify and that Mr. Archie could not stop him from testifying if that is what Eljvir wanted to do. Eljvir Duka was also present when Mr. Archie answered in the affirmative and also present when Mr. Archie told this Court that Eljvir's *decision* was not to testify. Eljvir Duka did not object to these statements by his trial counsel at the colloquy that Eljvir Duka now states were factually incorrect.

Furthermore, not only did this Court question Eljvir Duka's trial counsel on whether Eljvir wanted to testify, but this Court also posed the questions directly to Eljvir Duka himself. To reiterate, this Court specifically questioned Eljvir Duka whether his attorney had advised him that he had the right to testify and that his attorney could not stop him from testifying. Eljvir Duka told this Court that he had.

Accordingly, Eljvir Duka's earlier statements to this Court during the testimonial waiver colloquy contradict what Eljvir Duka is now telling the Court several years later in his § 2255. This discrepancy is an important factor in this Court determining that Eljvir Duka is not credible. As he has now been convicted and sentenced to life imprisonment, Eljvir Duka has a strong motive to lie that was not present when he spoke before this Court during the testimonial waiver colloquy in 2008. Eljvir Duka's statement that he felt "done" during the colloquy does not

explain why he told the Court that Mr. Archie had advised him that it was his right to testify, that Mr. Archie could not force him not to testify and that he chose not to testify. Nevertheless, Eljvir Duka has presented some additional issues that must be addressed.

As noted, Eljvir Duka testified about a meeting that he purportedly had with Mr. Archie after the trial but prior to sentencing where Mr. Archie told him that he "messed up." Furthermore, at this meeting, Mr. Archie purportedly told Eljvir that he had previously "messed up" a client's case and went on the stand in that case and told the Supreme Court that it was his fault. It is this conversation with Mr. Archie that Eljvir was referencing in his subsequent December, 2013 letter to Mr. Archie according to his testimony. Mr. Archie states that this conversation with Eljvir never happened. This Court does not find Eljvir's testimony as to this meeting credible for the following reasons.

The case that Mr. Archie was previously involved in was *State v. Nunez-Valdez*, 2008 WL 2743963 (N.J. Sup. Ct. App. Div. July 16, 2008), *reversed by*, 975 A.2d 418 (N.J. 2009). In that case, Mr. Archie represented a defendant during a plea hearing where the defendant ultimately pled guilty. *See Nunez-Valdez*, 2008 WL 2743963, at *1. During post-conviction relief ("PCR") proceedings, the New Jersey Superior Court vacated the plea by stating the following:

> for this defendant, the only real question following his guilty plea was when the federal government would arrive to begin deportation proceedings against him. Therefore, because the defendant's attorneys told him that his immigration status would not be affected by a decision to accept the plea bargain and plead guilty, the defendant was affirmatively "misinformed" by his attorneys as to the immigration consequence that would result from following their advice.
>
> Because the immigration consequence resulting from pleading guilty to the charge against him was material to the defendant's decision and because the defendant's attorneys misinformed him as to the immigration consequence of pleading guilty, and because the defendant reasonably relied on the misinformation provided by his

> attorneys in deciding to plead guilty, the defendant has met his
> burden and demonstrated by a preponderance of the evidence that
> his 10 June 1998 guilty plea was not made knowingly, voluntarily
> or intelligently.

*Id.* at *7. However, on appeal of that PCR Court decision, on July 16, 2008, the New Jersey

Superior Court Appellate Division reversed and found that the defendant had "failed to offer

competent proof that he was misinformed of the consequences of his plea . . . and thus that the

plea was not given voluntarily, knowingly, and intelligently." *Id.* at *9. Nevertheless, on July 27,

2009 (as corrected on July 30, 2009), the New Jersey Supreme Court reversed the Appellate

Division decision and stated as follows:

> [T]he Appellate Division concluded that the trial court's findings
> were not supported by an adequate factual foundation. We
> disagree. Our review of the record satisfies us that based on the
> testimony of the witnesses, the trial court did not abuse its
> discretion in crediting defendant's account that he received
> misleading or false information about immigration consequences.
> Indeed, the trial court was not obliged to credit all of the
> defendant's testimony and was entitled to draw inferences from the
> evidence and make factual findings based on [its] 'feel of the case.'
> This is precisely what the trial court did. The Court accepted some
> of defendant's testimony and rejected other portions. Further, the
> trial court gave reasons for its disbelief of Archie's account that he
> told defendant that deportation was a possibility. The court
> reasoned that if Archie were as familiar with immigration law as
> he professes to have been at the time of the plea, then he would
> have outlined to defendant the deportation consequences in greater
> detail, i.e., that deportation was a virtual certainty. Additionally, it
> was not disputed that neither Smith [defendant's other attorney]
> nor Archie ever informed defendant that federal law mandated
> deportation for "any alien who is convicted of an aggravated
> felony," 8 U.S.C.A. § 1227(a)(2)(A)(iii), and that the crime to
> which defendant would plead guilty was an aggravated felony.

*Nunez-Valdez*, 975 A.2d at 426. The New Jersey Supreme Court then also determined that the

defendant satisfied the prejudice prong of *Strickland* by stating as follows:

> [T]he trial court accepted defendant's testimony that he would not
> have pled guilty if he had known he would be deported, and found

that defendant did not give a knowing, voluntary or intelligent plea. Based on the trial court's findings, which are amply supported by the record, defendant satisfied the prejudice prong of the ineffective-assistance-of-counsel analysis by showing that he would not have pled guilty but for the inaccurate information from counsel concerning the deportation consequences of his plea.

*Id.* According to Eljvir Duka, Mr. Archie was purportedly referencing this case when he spoke to Eljvir that he "messed up" in his case after trial but prior to sentencing. However, due to several inconsistencies, this Court finds that Mr. Archie's testimony that this conversation never happened to be more credible.

First, contrary to Eljvir's testimony of what Mr. Archie purportedly told him, *Nunez-Valdez* does not reflect that Mr. Archie took the stand to tell the Court that it was "his fault" in that case. Indeed, the New Jersey Supreme Court summarized Mr. Archie's testimony during Nunez-Valdez's PCR proceedings as follows:

> Archie testified *on behalf of the State*. Archie said that at the time of the plea, he had been practicing law for two years and that his practice was ninety percent criminal. Archie stated that, with the assistance of an interpreter, he read each line of the plea agreement to defendant, explained it to him, and asked if he had any questions. Based upon defendant's answers, Archie then circled the applicable responses on the plea form. He said he was "pretty sure" he talked about deportation, but he could not recall the substance of the conversation on whether defendant was concerned about it. He believed the subject came up in reviewing question seventeen on the plea form that asked defendant "[d]o you understand that if you are not a United States citizen or national, you may be deported by virtue of your plea of guilty?" Archie recalled that he told defendant that deportation was a "possibility." He did not request a Spanish version of the plea form, although the Megan's Law form he used had a paragraph translated into Spanish. Archie admitted that he never told defendant that he would be deported if he pled guilty.

*Nunez-Valdez*, 975 A.2d at 421 (emphasis added). Neither the Appellate Division nor the New Jersey Supreme Court decisions indicate that Mr. Archie ever testified in *Nunez-Valdez* that it

was "his fault." Thus, it makes little to no sense that Mr. Archie would have told Eljvir Duka that

he "went on the stand and . . . told them that it was [his] fault" in that case when his testimony

never appeared to reflect that he ever told that court that it was "his fault." Indeed, as detailed

above, in *Nunez-Valdez*, Mr. Archie was a witness for the state, not the defendant.

Second, and perhaps most importantly, the timing of when Eljvir Duka states that this

conversation with Mr. Archie took place is an important aspect worth considering. Eljvir testified

at the evidentiary hearing that the purported conversation with Mr. Archie occurred after trial,

but before he was sentenced. The jury returned its verdict against Eljvir Duka on December 22,

2008, and he was sentenced on April 28, 2009. This would mean that according to Eljvir Duka's

testimony, his conversation with Mr. Archie occurred between those two dates. However, during

this period, the operative and controlling Opinion in *Nunez-Valdez* was the Opinion from the

Appellate Division which ruled on July 16, 2008, as the New Jersey Supreme Court did not issue

its decision until July 27, 2009. To reiterate, the Appellate Division held that the "defendant

failed to offer competent proof that he was misinformed of the consequences of his plea." *Nunez-

Valdez*, 2008 WL 2743963, at *9. Thus, in between verdict and sentencing in this case, the

Appellate Division had not found Mr. Archie ineffective in *Nunez-Valdez*. Therefore, Eljvir

Duka's version of his purported conversation with Mr. Archie strains credulity because at the

time it purportedly occurred, the operative court opinion had found that Mr. Archie had not

"messed up."

Moving forward, this finding also affects how this Court views Eljvir Duka's December,

2013 letter to Mr. Archie. Eljvir Duka and Mr. Archie have divergent views of what this letter

represents. Eljvir Duka claims that this letter was sent to Mr. Archie to serve as a reminder of

their purported previous conversation where Mr. Archie told him that he "messed up" in a prior

case. Mr. Archie testified that he took this December, 2013 letter to mean that he should fall on his sword and perjure himself to go along with Eljvir's claims in his § 2255 motion. Because Eljvir Duka's testimony regarding his prior conversation with Mr. Archie is inconsistent both with its content and timing, this Court also finds that Mr. Archie's testimony regarding the December, 2013 letter to be the more credible of the two meanings suggested for the December, 2013 letter.

Compared to Eljvir Duka's testimony, this Court finds Mr. Archie's testimony more credible. Mr. Archie had approximately ten years of experience as an attorney at the time of trial in this case. Mr. Archie's testimony does not have the same contradictions as does Eljvir Duka. For example, Mr. Archie's evidentiary hearing testimony is consistent with what he told this Court during the testimonial waiver colloquy. More specifically, on both occasions, Mr. Archie told this Court that he explained to Eljvir Duka that the ultimate decision of whether he was to testify or not was his to make and that he decided *not* to testify. Eljvir Duka attempts to argue that Mr. Archie has a greater motive to lie because a finding that he was ineffective would greatly affect his legal practice. While such a statement may be true in the abstract, this Court does not find that such an argument is enough to overcome the significant inconsistencies in Eljvir Duka's statements to this Court as well as his strong incentive to lie now that he has been convicted as opposed to his statements he made to this Court during the testimonial waiver colloquy when he had not yet been convicted.

For the foregoing reasons, this Court finds that Eljvir Duka's version of what transpired with respect to Mr. Archie's purported ineffectiveness is not credible. Accordingly, as Eljvir Duka is not credible on the relevant issues, he is not entitled to federal habeas relief on his sole

remaining claim. Therefore, Eljvir Duka's claim that his decision not to testify was the result of attorney coercion is denied.

C.  Shain Duka's § 2255

i.  *Shain Duka's Testimony*

The last of the Dukas to testify at the January 6, 2016 evidentiary hearing was Shain Duka. Shain explained that the subject of him testifying at trial came up starting at the initial meeting with his attorney, Mr. Riley. (*See id.* 245) Mr. Riley told him that this may be a case where Shain might testify. (*See id.* 245-46) Shain did not express a reluctance to testify nor did he say that he did not want to testify. (*See id.* 246) Furthermore, Shain stated that after reviewing the audiotapes, he learned that he should testify to clarify the misrepresentations as stated in the audiotapes. (*See id.* 247) Additionally, after hearing trial testimony, Shain became even more convinced that he needed to testify. (*See id.* 253)

Shain testified that Mr. Riley told him during the trial that he would have to start preparing Shain to testify, but that never occurred. (*See id.* 252) Despite him and his brothers wanting to take the stand in their own defense (*see id.* 255), Shain testified that he did not recall Mr. Riley ever telling him that he had an absolute right to testify in his own defense. (*See id.* 256)

Shain was also questioned about the December 9, 2008 meeting prior to the testimonial waiver colloquy. Shain testified that all of the defendants were within earshot of each other at this meeting. (*See id.* 257) Shain testified that all of the defendants "stuck to their guns" and stated that they wanted to take the stand at that meeting. (*See id.*) However, according to Shain, the lawyers came into the meeting and all said they believed that the defendants should not take the stand. (*See id.* 258) Mr. Riley then also told Shain that he was not prepared for Shain to take

the stand. (*See id.* 259) Shain became upset with Mr. Riley because he had never come over to

the prison where Shain was being detained to prepare him to take the stand. (*See id.* 258) Shain

stated the reason why he chose not to take the stand in his own defense was because Mr. Riley

told him he was not prepared. (*See id.* 259) Furthermore, Shain testified that his other co-

defendants discussed this issue and that they also said that their lawyers had told them that they

were not prepared as well. (*See id.* 260) Shain states that he did not ask Mr. Riley for more time

because he thought that the decision on whether he was going to testify had to be made that day.

(*See id.* 260)

Shain also explained that the lawyers told them that the colloquy itself was a formality

and that they should tell him that they are not going to testify. (*See id.* 260-61) He then told this

Court at that colloquy that he was not going to testify.

During cross-examination, Shain stated that the first time Mr. Riley told him he was

unprepared to put him on the stand was at the meeting immediately prior to the testimonial

waiver colloquy on December 9, 2008. (*See id.* 268) He further stated that he wished he had told

this Court during the colloquy that Mr. Riley told him he was unprepared. (*See id.* 269) While

Shain stated during the evidentiary hearing that Mr. Riley may have told him that he had a right

to testify, Shain explained that he made his decision not to testify because Mr. Riley had told him

just prior to the colloquy that he was unprepared. (*See id.* 273)

ii.     *Michael Riley Testimony*

Mr. Riley testified that he has been an attorney for forty years. (*See id.* 285) He further

stated that he told Shain that the decision of whether he testified was purely his to make. (*See id.*

291) According to Mr. Riley, at no time did he ever tell Shain that he was not prepared to call

him as a witness. (*See id.* 281) Furthermore, Shain never told him that he wanted to testify as opposed to just thinking about whether to testify. (*See id.*)

In the time immediately prior to the December 9, 2008 testimonial waiver colloquy, Shain told Mr. Riley that he did not want to testify. (*See id.* 283) Mr. Riley explained during direct examination that had Shain told him at the last minute that he wanted to testify, this would have been a "180" and Mr. Riley would have needed some more time. (*See id.* 285) During cross, Mr. Riley expounded on this point that he would not have been ready that particular minute to put Shain on the stand, but would have needed a couple of days. (*See id.* 329, 330) Nevertheless, Mr. Riley explained that if this was Shain's wish, it would have been his obligation as his attorney to bring it to the court's attention. (*See id.* 292) However, Mr. Riley stated that he was not surprised when Shain responded to the colloquy the way that he did because he felt that it was consistent with his prior conversations with Shain that he did not want to testify. (*See id.* 301)

With respect to Dritan and Eljvir, Mr. Riley also testified that he never heard them say that they wanted to testify. (*See id.* 297) Instead, Mr. Riley explained that he heard them say that they did not want to testify. (*See id.*)

On cross-examination, Mr. Riley stated that he does not recall having any notes memorializing a conversation he had with Shain about whether he wanted to testify or not. (*See id.* 303) Nevertheless, Mr. Riley stated that he a strong memory of consistently informing Shain that the decision to testify was his to make. (*See id.* 307)

Mr. Riley also recalled a specific instance where the issue of Shain potentially testifying arose and testified as to that instance as follows:

> I recall a number of us sitting around a conference table. I think all of us, all of the defendants were around the conference table. I

don't know – there were other colleagues of mine there but I couldn't tell you exactly who, because there was always a shift of who's in and who's out. We would exchange positions all the time. And the topic came up about testifying, and we openly discussed that, you know, Tony was a hothead and could cause problems, Elvis was more of a hard core, hard core fellow that was buying into some of the information that was causing people to become more radicalized, and he was therefore not a good candidate.

And I remember that's when we talked about, collectively talked about Shain as the person that would most likely be the one that would – if someone's going to testify, it would have been him. And at the time I remember, the reason I remember this so vividly, Shain was sitting across the conference table directly in front of me. So, when we said that I looked at him and he, you know, like he always did, he kind of laughed and shrugged his shoulders and went like this, no, no, no, Riley, no, no, no. And that was his response, and I recall that vividly. Now, did we talk about it on other occasions? I'm sure we did. But I do remember that vividly.

(*See id.* 308-09) Mr. Riley further explained that Shain was intimidated by Mr. Fitzpatrick, who was one of the prosecutors who prosecuted this case. (*See id.* 310)

   iii.    *Analysis of Shain Duka's Claim*

This Court does not find Shain Duka's testimony to be credible to permit a finding that Mr. Riley's conduct fell below an objective standard of reasonableness. Shain Duka testified that his testifying at trial came up during his initial meeting with Mr. Riley and that he became more convinced he needed to testify as the pretrial and subsequent trial process proceeded. Shain Duka also stated that he never recalled Mr. Riley ever telling him that he had an absolute right to testify in his own defense. At the December 9, 2008 meeting prior to the testimonial waiver colloquy, Shain also testified that he told Mr. Riley that he wanted to take the stand. However, according to Shain Duka, Mr. Riley advised him against testifying at that meeting and eventually told him that he was not prepared to put him on the stand. This left him shocked and angry.

Shain Duka's testimony at the evidentiary hearing is directly contradicted by what this Court heard at the testimonial wavier colloquy. Indeed, Shain Duka was present when this Court questioned Mr. Riley at that colloquy whether he had advised his client that he had an absolute right to testify and that he did not have to follow counsel's advice if he wanted to testify. Shain Duka was also present when Mr. Riley told this Court that Shain Duka *elected* not to testify. Shian Duka did not object to these statements by his trial counsel at the colloquy.

However, not only did this Court question Shain Duka's attorney on whether he wanted to testify; additionally, this Court posed the questions directly to Shain Duka as well. Indeed, this Court specifically questioned Shain Duka whether his attorney had advised him that he had the right to testify and that his attorney could not stop him from testifying. Despite being purportedly so angry and in shock based on Mr. Riley's purportedly unpreparedness, Shian Duka nevertheless responded to this Court's inquiry that what Mr. Riley told the Court was true and that he "won't testify."

Shain Duka's earlier statements to this Court during the testimonial waiver colloquy at trial contradict what Shain Duka has told this Court in this § 2255 proceeding. His inconsistency is an important factor in this Court's ultimate conclusion that Shain Duka's testimony is not credible on the issue of Mr. Riley's purported ineffectiveness. Since that colloquy, Shain Duka has been convicted and sentenced to life imprisonment. Thus, he has a strong motive to lie that was not present when he spoke before this Court during the colloquy in 2008. Nevertheless, Shain Duka does attempt to explain away the statements he made at the colloquy by stating that Mr. Riley told him the colloquy was but a formality.

Shain Duka testified that he was frustrated, shocked and mad when Mr. Riley purportedly told him that he was not prepared to put him on the stand prior to the testimonial waiver

colloquy. However, despite all of these strong emotions, Shain Duka never objected to Mr. Riley's statements during the colloquy and told this Court that Mr. Riley's statements were true and that he "won't testify." Given the strong nature of the emotions purportedly felt by Shain as announced by him during these § 2255 proceedings, this Court finds it incredible that Shain would then sit by and not say anything in disagreement with Mr. Riley at the colloquy only because Mr. Riley told him that it was a formality. Indeed, as discussed previously, this Court's record with the defendants in this case indicated the due care that this Court took with respect to the defendants complaints (such as their complaints with access to discovery while detained at the Federal Detention Center in Philadelphia during the pretrial proceedings).

Compared to Shain Duka, this Court finds Mr. Riley to be the more credible witness. Mr. Riley had thirty-two years of experience as an attorney at the time of trial in this case. His testimony during the evidentiary hearing was consistent with what he told this Court during the testimonial waiver colloquy. Additionally, this Court was struck by the vivid recollection and detail Mr. Riley espoused during the evidentiary hearing with respect to one incident he recalled where Shain specifically indicated that he did not want to testify. Indeed, Mr. Riley testified and specifically illustrated to this Court how Shain Duka negatively reacted by waiving his hands in protest when asked if he wanted to testify prior to the end of trial.

Upon considering the testimony of Shain Duka and Mr. Riley, this Court finds that Shain Duka's testimony is not credible on the issue of Mr. Riley's ineffectiveness. Accordingly, Shain Duka is not entitled to federal habeas relief on his sole remaining claim that his decision not to testify was the result of attorney coercion.

## V.  CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c), unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken from a final order in a proceeding under 28 U.S.C. § 2255. A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). Applying this standard, this Court finds that a certificate of appealability shall not issue in this case on the Duka's sole remaining claim that their decision to not testify at trial was the result of attorney coercion.

## VI.  CONCLUSION

For the foregoing reasons, the Dukas' sole remaining claim is denied. Appropriate orders will be entered consistent with this Opinion.


DATED:  May 27,  2016                                      s/Robert B. Kugler
                                                          ROBERT B. KUGLER
                                                          United States District Judge